IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2020

**STATE OF TENNESSEE v. DEVIN ROGERS**

**Appeal from the Criminal Court for Shelby County**
**No. 17-04239; C1707165      Lee V. Coffee, Judge**

_____

**No. W2019-01841-CCA-R3-CD**
_____

The Defendant, Devin Rogers, appeals from his Shelby County Criminal Court convictions for aggravated robbery and aggravated burglary, for which he received an effective eleven-year sentence. On appeal, the Defendant contends that the evidence was insufficient to support his convictions, arguing that his co-defendant's testimony was "wildly contradictory" to that of the victim. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Joseph A. McClusky (on appeal), and Juni S. Ganguli (at trial), Memphis, Tennessee, for the appellant, Devin Rogers.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kevin D. McAlpin and Meghan S. Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from an April 17, 2017 incident in which Robert Palmer invited a woman he met online, Kimmelia Wiley, to his home for sexual activity. During this visit, the Defendant, who was in a romantic relationship with Ms. Wiley, entered the house uninvited, held Mr. Palmer at gunpoint, stole his wallet, and fired a shot into the living room ceiling. The July 2017 term of the Shelby County Grand Jury indicted the Defendant

and Ms. Wiley[1] for aggravated robbery, a Class B felony; aggravated burglary, a Class C felony; and identity theft, a Class D felony.[2] See Tenn. Code Ann. §§ 39-13-402, -14-403, -14-150.

At trial, Mr. Palmer testified that he was married and had one college-aged son. On April 17, 2017, Mr. Palmer's wife left for a business trip in the morning, and his son was not at home. Mr. Palmer stated that after his wife's departure, he posted an advertisement on Craigslist soliciting an "afternoon get-together." Around noon, Mr. Palmer received a response to his advertisement and began communicating by email with a woman later identified as Ms. Wiley, whom Mr. Palmer knew as "Kimmelia Rogers." After two or three hours of exchanging messages and discussing a meeting, Mr. Palmer told Ms. Wiley where he lived, and she agreed to come to his house. Ms. Wiley arrived around 4:00 p.m.; Mr. Palmer noted that it was raining outside and that Ms. Wiley was "[s]oaking wet." Mr. Palmer invited Ms. Wiley inside, and she showered while Mr. Palmer dried her clothing. Afterward, Ms. Wiley and Mr. Palmer drank wine and conversed for a few minutes to "see where things [would go] from there."

Mr. Palmer testified that he and Ms. Wiley went to his bedroom and engaged in sexual intercourse. Mr. Palmer heard a "chime" indicating that his front door had been opened; believing that his son may have come home early, Mr. Palmer put on a t-shirt and told Ms. Wiley to "go and hide in the closet" because Mr. Palmer did not want his son to see her. Ms. Wiley did as he requested, and Mr. Palmer walked out of the bedroom and into the hallway, where he encountered two men, one of whom pointed a gun at him. Mr. Palmer later identified the man with the gun as the Defendant and noted that the Defendant kept the gun pointed at him throughout the encounter. The Defendant demanded money, and Mr. Palmer asked the men who they were. Mr. Palmer noted at trial that he did not customarily keep cash in his house. Mr. Palmer told the men that the only money he had was in his wallet and that he could take them to another location to obtain cash; the Defendant indicated that he wanted Mr. Palmer's wallet, which was in the kitchen. Mr. Palmer retrieved his wallet and gave it to the Defendant. The Defendant directed Mr. Palmer to walk back toward the front door and lie on the floor; when Mr. Palmer moved more slowly than desired, the Defendant shot a bullet into the ceiling. Once Mr. Palmer was on the floor, the Defendant demanded that he stand up and close the front door, which was a "huge iron front door" that was standing halfway open. Mr. Palmer moved toward the front door; the Defendant told him to stop; and Mr. Palmer seized the opportunity to

---

[1] A motion or order to sever the co-defendants is not present in the record. However, it is apparent that the Defendant and Ms. Wiley were tried separately.

[2] The judgment form for Count 3 reflects that the State declined to prosecute, and the record reflects that Count 3 was not included in opening arguments or the trial court's preliminary jury instructions.

run outside, shutting the door behind him, and he fled to a neighbor's house. Mr. Palmer's neighbor retrieved a gun while the neighbor's wife called the police, and Mr. Palmer and his neighbor "stood there and . . . saw them running out of the house[.]" Mr. Palmer clarified that the Defendant, the other man, and Ms. Wiley exited the house together; Ms. Wiley was nude because her clothes were still in Mr. Palmer's dryer.

Mr. Palmer testified that to his knowledge, Ms. Wiley never emerged from the closet during the robbery. Mr. Palmer stated that his wallet and a laptop computer were taken and that his credit cards were subsequently used for fraudulent purchases at a shoe store, a convenience store, and a Dillard's department store. The stolen items were never recovered. Mr. Palmer stated that although he thought the wallet contained thirteen dollars at the time of the robbery, upon further reflection, he did not believe the wallet contained any cash.

Mr. Palmer denied that he agreed to pay Ms. Wiley. He said, though, that he agreed to give Ms. Wiley money for gasoline because she had expressed concern about having enough gasoline to return home due to his house's remote location. Mr. Palmer planned to accompany Ms. Wiley to a nearby gas station after her visit. Mr. Palmer agreed that Ms. Wiley asked him if he worked in law enforcement; he noted that he thought the question was odd, but concluded that she perhaps had friends or family in law enforcement "and didn't want to have any involvement there."

Mr. Palmer testified that when the police arrived, he initially told them only that Ms. Wiley had appeared at his door asking for directions; he noted that this was true because Ms. Wiley had asked for directions and that because she looked "totally different" than her photograph, he was uncertain whether she was the woman he invited to the house. Mr. Palmer agreed, though, that he was "not as truthful as [he] should have been" with the police about the circumstances of Ms. Wiley's presence at the house. He explained that he was "trying to protect as much as [he] could without letting [his] wife and family know what had gone on," but that the police quickly ascertained that "there was obviously more to the story than that." Mr. Palmer denied ever telling the police that two women and one man were present during the robbery, and he agreed that any police report reflecting such contained a typographical error.

Mr. Palmer testified that the bullet the Defendant shot went through the living room ceiling and into his son's closet. Mr. Palmer stated that at the time of the robbery, he had been married to his wife for almost thirty years; as a result of this incident, he was no longer married at the time of trial.

Mr. Palmer identified copies of a text message conversation that occurred in the early morning hours on the day after the robbery. The incoming messages were from a telephone number with which Mr. Palmer was not familiar.

The messages[3] were received as an exhibit and reflected that between 1:33 a.m. and 4:46 a.m. on April 18, 2017, Mr. Palmer exchanged text messages with an individual claiming to be Ms. Wiley's father. At one point, Mr. Palmer began calling the person "Ray," possibly in response to receiving an email message from him.

In the text messages, Ray called Mr. Palmer a pedophile and asserted that Ms. Wiley was sixteen years old. Ray stated that his son, Ms. Wiley's brother, had told Ray "where he found his sister," that his son recorded Ms. Wiley's running away from Mr. Palmer's house nude, and that his son sent Ray copies of text messages and telephone call logs documenting Mr. Palmer's contacting Ms. Wiley. Ray said that he had messages in which Mr. Palmer told Ms. Wiley he would answer the door nude upon her arrival and that Ray knew Mr. Palmer gave Ms. Wiley alcohol. Ray claimed that he was a Shelby County prosecutor, that he had obtained Mr. Palmer's wife's telephone number from a police officer, and that he would tell Mr. Palmer's wife "about the pedophile she's laying [sic] next to every night[.]" Ray said that he had Ms. Wiley "swabbed for any interference or intercourse." Ray conveyed that he was "furious and sickened"; however, Ray later stated, "[A]s a man[,] I could give you a chance for this [] matter to never get back to your wife at all[,] would you like to accept [a] last and only chance for redemption[?]" Ray proceeded to demand that Mr. Palmer pay him $3,000 in exchange for not sending the evidence of Mr. Palmer's activities to his wife.

In the messages, Mr. Palmer responded that he had "turned everything over" to the police and that the matter was "out of [his] hands now." Mr. Palmer stated that "[t]his didn't have to happen" and asked why Ray tried to rob him and shot a gun in Mr. Palmer's house. Mr. Palmer averred that he had no knowledge of Ms. Wiley's being a minor and that he had relied upon her statement that she was "an adult" who was working after dropping out of nursing school. Mr. Palmer eventually conveyed his belief that Ray had no knowledge of the robbery, describing the incident as "unfortunate," and Mr. Palmer urged Ray to investigate the dangerous men with whom Ms. Wiley was "mixed up[.]" Mr. Palmer stated that the men brought Ms. Wiley to his house with the intention of robbing him. After Ray demanded money, Mr. Palmer expressed skepticism that a prosecutor would commit a "highly unethical and illegal" act, and Mr. Palmer stated that "this

---

[3] We note that some of the incoming messages appear to have been divided into parts and that the partial messages came through to Mr. Palmer's cell phone out of order. Mr. Palmer was not asked to read the messages aloud or clarify their meaning; however the substance of the messages was readily ascertainable notwithstanding their presentation at trial.

situation [was] bad enough as it [was] without being involved with blackmail and extortion." Mr. Palmer said that Ray planned to destroy the lives of Mr. Palmer and his family and that the situation was out of Mr. Palmer's control. Mr. Palmer stated that he did not know with whom he was conversing, but that he did not believe any father would use his daughter for money in this manner.

Mr. Palmer testified that he did not know the identity of the person who sent the messages, although it was apparent that the person was familiar with the robber. Mr. Palmer took the text messages to the police later that day, and on April 19, 2017, he completed a photograph lineup for the police and identified the Defendant as the man with the gun. Mr. Palmer stated that he was one hundred percent certain his identification was accurate.

On cross-examination, Mr. Palmer testified that the police never swabbed his hands for gunshot residue; he denied that he fired the gun. Mr. Palmer agreed that his wife left at 6:30 a.m. to go to the airport and that after she left, he posted the Craigslist advertisement. He agreed that he posted the advertisement, as opposed to responding to an existing advertisement. Mr. Palmer admitted that he had solicited "relations" on Craigslist on previous occasions. Mr. Palmer explained that the advertisement was a "recurring ad" that would appear multiple times over a period of days. He agreed that he was "trolling for women for hopefully two or three days" and that his advertisement specifically referenced oral sex. Mr. Palmer stated that he did not believe he was patronizing prostitution. When asked whether he believed that a woman would respond to the advertisement and perform oral sex on him without compensation, Mr. Palmer responded, "Yes, but it wasn't just all about that. There was more to the posting than just that."

Mr. Palmer agreed that "Kimmelia Rogers" responded to the advertisement and that when she arrived at the house, he asked her if he could take her wet clothes and dry them. Mr. Palmer denied that his arrangement with Ms. Wiley to pay for her gas was a "prostitution arrangement," explaining that "the initial agreement was [not] that [he] was going to pay her for sex." Mr. Palmer repeatedly disagreed with defense counsel's characterization that Ms. Wiley or Mr. Palmer "wanted" her to remove her clothing upon her arrival at the house. Mr. Palmer stated that after the robbery but before the police arrived, he took Ms. Wiley's clothing out of the dryer and laid it on his bed. He noted that when he returned to the house, a "spread" that was in the laundry room was on the floor and that he assumed the two men had unsuccessfully searched for Ms. Wiley's clothing. He denied that Ms. Wiley removed her clothing in his bedroom.

Mr. Palmer disagreed with defense counsel's assertion that "everything went to pieces" after he had sex with Ms. Wiley and it became apparent that he had no cash with

which to pay her. Mr. Palmer denied that Ms. Wiley began yelling before the men entered the house. When asked whether he told the police that one woman and one man forced their way into the house, Mr. Palmer stated that Ms. Wiley was the only woman present. Mr. Palmer repeatedly admitted to having lied to the police; he agreed that he maintained the lie for the first twenty-two minutes of his fifty-four-minute recorded police statement. Mr. Palmer stated that he had also signed an advice of rights waiver about twenty-two minutes after he began speaking to the police and that he asked the officers if he needed to have an attorney present. Mr. Palmer maintained, though, that he had committed no crime.

Mr. Palmer testified that in his initial police statement, he told officers that the "girl" who came to his door appeared to be about thirteen years old. Mr. Palmer noted that his estimate of Ms. Wiley's age was consistent with his initial impression of her appearance. He noted that after Ms. Wiley entered, she explained that she was the woman who responded to his Craigslist advertisement and averred that she was twenty-six years old. Mr. Palmer noted that he was fifty-seven years old at the time of the robbery. Mr. Palmer stated that during his initial discussion with the police, it was established that Ms. Wiley was seen running away from Mr. Palmer's house while nude. Mr. Palmer agreed that he had reported answering the door while wearing a "very long t-shirt." He further agreed that when the officers asked him why Ms. Wiley knocked on his door, he claimed not to know. Mr. Palmer thought that he omitted from his initial police statement having taken Ms. Wiley's clothing from his dryer and placing it on his bed. Mr. Palmer agreed that after the police asked why her clothing was on the bed, the officers told him that his version of events was "just not adding up."

Mr. Palmer maintained that he did not have a contractual relationship with Ms. Wiley, and he averred that many lonely women were willing to "come over to a strange man's home and have relations with [him] just because[.]" Mr. Palmer stated that on previous similar occasions, women had come to his house or he had gone to their homes in order to have sex. He stated, though, that he did not engage in such activities "that often."

Shelby County Sheriff's Detective William Greever testified that he responded to the crime scene and spoke to Mr. Palmer. Detective Greever stated that the police found a .40-caliber shell casing in the living room and that a bullet hole was visible in the living room ceiling. He noted that at a later date, Mr. Palmer found a spent bullet and provided it to the police. Detective Greever said that the police also collected latent fingerprints from a wine glass in Mr. Palmer's bedroom but that the fingerprints did not match any prints in their database.

Detective Greever stated that the presence of the bullet hole was inconsistent with Mr. Palmer's initial statement, which was that a young woman had come to his door asking

–6–

for directions, at which point two men entered the home with a gun and demanded money. After further investigation, Mr. Palmer disclosed to Detective Greever that two men had entered the house while he was "entertaining a female guest" and that the men robbed him. Mr. Palmer stated that one of the men demanded money and "presented a weapon"; Mr. Palmer told the men that he had no money, and the man with the gun fired it. Detective Greever acknowledged the possibility that a police report referring to two women having been present contained a typographical error. After Detective Greever confronted Mr. Palmer further, Mr. Palmer disclosed the full version of events, including his having invited Ms. Wiley to the house "for an afternoon of fun" after meeting on Craigslist.

Detective Greever testified that the following day, Mr. Palmer contacted the police and provided them with the threatening text messages he received. Detective Greever requested the cell phone records associated with the telephone number number, which reflected that the number belonged to "Diane Rogers." Detective Greever stated that according to his "very basic understanding," Ms. Rogers "had some paperwork filled out linking her to [the Defendant] in the form of . . . a marriage license." Detective Greever created a photograph lineup including the Defendant's photograph, and two days after the robbery, Mr. Palmer identified the Defendant as one of the men who robbed him. The Defendant was located by police several months later in California or Nevada.

On cross-examination, Detective Greever testified that Mr. Palmer's hands were not tested for gunshot residue. He acknowledged that Mr. Palmer never mentioned in multiple statements that Ms. Wiley hid inside a closet. Detective Greever stated that Ms. Rogers's clothing being on Mr. Palmer's bed and the presence of partially full wine glasses and food in the bedroom were inconsistent with Mr. Palmer's initial statement. Detective Greever stated that although another detective spoke to the Defendant's neighbor, police did not search the neighbor's home. He agreed that if Deputy Hunter Black wrote in his report that a witness stated that two women and one man were present during the robbery, it was likely accurate.

Shelby County Sheriff's Deputy Hunter Black testified that he responded to Mr. Palmer's house at 5:22 p.m. on the day of the robbery. Deputy Black observed the bullet hole in the living room ceiling and took Mr. Palmer's initial statement, which was consistent with Mr. Palmer's and Detective Greever's descriptions. Deputy Black stated, though, that Mr. Palmer reported that after Ms. Wiley knocked on his door, another woman and a man forced their way into the home.

Kimmelia Wiley testified that she had been charged jointly with the Defendant for aggravated robbery and aggravated burglary and that her case was still pending at the time of the Defendant's trial. She affirmed that she had no existing offer or agreement with the

State, although she stated that she hoped for "some consideration" from the State in exchange for her testimony.

Ms. Wiley testified that on April 17, 2017, she met Mr. Palmer when he responded to her Craigslist advertisement. Mr. Palmer contacted Ms. Wiley by telephone; they exchanged emails; and they agreed to meet for "[s]exual favors for money." She stated that although several inherent safety concerns existed in sex work, she "ha[d] so many things going on in [her] life that [she] just turn[ed] to that." Ms. Wiley agreed that in order to avoid trouble with law enforcement, she did not typically refer to sexual favors explicitly in her communications and that she used "code names" known to lay persons but unknown to undercover officers.

Ms. Wiley testified that she agreed to meet Mr. Palmer at his home and that she had never been there before. She acknowledged the possibility that a third party could send her to a person's house as a prank, and she agreed that going to a new place was "taking a chance[.]" Ms. Wiley stated that she drove to Mr. Palmer's house in her car and that the Defendant accompanied her. She noted that the Defendant was her best friend's cousin and that at the time of the robbery, Ms. Wiley and the Defendant had been in a romantic relationship for five months. Ms. Wiley stated that the Defendant knew she was meeting Mr. Palmer for sex and that although he had not accompanied her to previous appointments, he persuaded her to take him to Mr. Palmer's house. Ms. Wiley stated that it was her practice to travel to appointments alone even though it presented a greater risk to her safety. Ms. Wiley was hesitant about the Defendant's accompanying her and offered to drop him off at multiple locations; however, he insisted that he "had nowhere to go." When Ms. Wiley arrived at Mr. Palmer's address, she parked on the street as instructed by Mr. Palmer and left the Defendant in the car.

Ms. Wiley testified that when Mr. Palmer answered the door, it was raining and that she asked to take a shower because her clothing was wet. Mr. Palmer took Ms. Wiley's clothing, and she did not know what he did with it. After the shower, Mr. Palmer and Ms. Wiley drank wine and "started having sexual intercourse." She estimated that she spent between forty-five minutes and one hour at the house. Ms. Wiley stated that although she did not discuss payment with Mr. Palmer, he had written in a text message that he would fill up her car with gasoline after they "got done."

Ms. Wiley testified that while she and Mr. Palmer were engaging in sexual intercourse, an alarm sounded that indicated an exterior door had been opened. Mr. Palmer told Ms. Wiley to get into his closet, and he put on a t-shirt. Mr. Palmer conveyed to Ms. Wiley that he thought his son might have come home and that Mr. Palmer's wife was on vacation. Ms. Wiley stated that she was afraid and did as she was told. From inside the closet, Ms. Wiley heard a voice she recognized as the Defendant's demanding

–8–

money from Mr. Palmer; she estimated that the Defendant was in the living room. Ms. Wiley heard Mr. Palmer say that he had no money, and the Defendant responded, "Do you think I'm playing with you[?]" Ms. Wiley then heard a gunshot; when asked what she thought had occurred, she said, "I thought maybe [the Defendant] shot and killed [Mr. Palmer]."

Ms. Wiley testified that she had no knowledge that the Defendant was going to rob Mr. Palmer; she stated that she did not wish for the robbery to occur. Ms. Wiley noted that she had no reason to rob someone if she was "coming there to make money" and that "this [was her] life that [she was] playing with." She stated that it was not her first time engaging in sex work and that it was "not [her] M.O. to do anything like that." Ms. Wiley agreed that working with familiar clients mitigated her risk and that she had hoped to gain Mr. Palmer as a regular client. She stated that Mr. Palmer's having been robbed interfered with her business.

Ms. Wiley testified that she stayed in the closet until the Defendant came looking for her; he told Ms. Wiley to put on her clothing and come with him. Ms. Wiley could not locate her clothing, so she and the Defendant ran out of the house while she was nude. Later that day, she saw the Defendant with Mr. Palmer's wallet; she stated that the Defendant used one of Mr. Palmer's credit cards at a gas station.

Ms. Wiley identified the telephone number associated with the threatening text message as belonging to the Defendant. She said that the morning after the robbery, the Defendant left his cell phone on his bed, and it began to sound; Ms. Wiley looked at the telephone and recognized Mr. Palmer's telephone number. Upon reading the exchange of text messages, Ms. Wiley ascertained that Mr. Palmer had called the police and that the Defendant had demanded money from Mr. Palmer in exchange for the Defendant's not telling Mr. Palmer's wife about the relevant events. Ms. Wiley and the Defendant left Tennessee soon after and traveled to California; Ms. Wiley was arrested in California on an active Tennessee warrant, but she was released and was told that the "State of Tennessee didn't want [her]." Ms. Wiley and the Defendant traveled to Nevada afterward. Ms. Wiley noted that she had no prior criminal history and that she knew her arrest was related to the incident involving Mr. Palmer. She said that she and the Defendant had discussed the warrant's having been based on the robbery and that as a result, the Defendant became aware that he had an active arrest warrant as well. Though Ms. Wiley wanted to travel back to Tennessee, the Defendant refused, and they were both arrested in Nevada.

Ms. Wiley agreed that in spite of her belief that the Defendant may have killed Mr. Palmer and the Defendant's having gotten Ms. Wiley into trouble, she continued their romantic relationship and corresponded with the Defendant after they were both in jail. Ms. Wiley stated, however, that she concluded that the Defendant did not have her best

interests at heart after a telephone conversation in which the Defendant urged Ms. Wiley to "take all the charges" in the hope that she would receive probation as a first-time offender. Ms. Wiley averred that her trial testimony was truthful.

On cross-examination, Ms. Wiley agreed that she understood the sentences she faced if she were convicted of aggravated burglary and aggravated robbery. She stated that although she did not wish to serve those sentences, "if [she] did something wrong or if the State fe[lt] like [she] did something wrong, [she was] willing to take [her] time." Ms. Wiley agreed that after her arrest, she was extradited to Tennessee and appeared in court in October or November of 2017; Ms. Wiley was held without bond until April 10, 2019, when she was released on her own recognizance. Ms. Wiley denied that the State moved to revoke her bail as a result of her failing to report for a drug screen on June 14, 2019.

The trial court instructed the jury that issuing or revoking bond was the court's decision and that it was not made at the State's request. The court informed the jury of the conditions of Ms. Wiley's release; stated that Ms. Wiley had completed a job readiness training program, group counseling, and a decisions-making class; and noted that Ms. Wiley was still on bond at the time of trial.

Ms. Wiley testified that she obtained sex work through Craigslist advertisements for about one year before this incident. Ms. Wiley affirmed multiple times that she was certain Mr. Palmer responded to her advertisement and that she did not respond to Mr. Palmer's recurring advertisement. She estimated that Mr. Palmer initially emailed her between 10:00 and 11:00 a.m. and that she arrived at his house between 1:00 and 2:00 p.m. When asked for an example of a code phrase she used to ensure she was not speaking to a member of law enforcement, Ms. Wiley stated that with Mr. Palmer, she used the phrase "pay to play" to discuss exchanging sexual favors for money. She agreed that Mr. Palmer seemed to know the meaning of the code phrase.

Ms. Wiley testified that after about one hour of exchanging emails, she and Mr. Palmer decided to meet at his home. Ms. Wiley stated that depending on the type of sexual contact, she charged between $500 and $1,500 for sexual intercourse and between $250 and $500 for oral sex; she sometimes collected payment beforehand, but sometimes waited until after services were rendered. Ms. Wiley noted that although she had not yet agreed on a price with Mr. Palmer, she would not have agreed to payment in the form of a tank of gasoline. Ms. Wiley stated that in addition to filling up her gasoline tank, Mr. Palmer planned to obtain cash at the gas station from an automated teller machine. Ms. Wiley agreed that she expected to be paid at least $500 and that a risk existed that Mr. Palmer would "drive off" without having paid her.

Ms. Wiley testified that she lived about twenty minutes from Mr. Palmer's house and that the Defendant was her only passenger. Ms. Wiley stated that she assumed Mr. Palmer took her clothing to place it in a dryer. She said her appearance at trial was substantially the same as her appearance on the day of the robbery; she did not believe that she looked like a thirteen-year-old girl. Ms. Wiley stated that after about thirty minutes of engaging in sexual intercourse, they were interrupted by the front door alarm.

Ms. Wiley testified that she only heard the Defendant's voice during the robbery, and she maintained that only the Defendant was present when she emerged from the closet. Ms. Wiley stated that after she and the Defendant left Mr. Palmer's house, they returned to Memphis. Ms. Wiley left Memphis alone the following day and later reunited with the Defendant in California. She stated that she did not report the incident to the police because she still loved the Defendant. Ms. Wiley said that she had previously used the name Kimmelia Rogers in an email address because she had hoped she and the Defendant would marry one day.

Ms. Wiley identified a letter [4] she wrote to the Defendant from jail and acknowledged that in the letter, she stated that the Defendant "didn't do anything" and advised the Defendant to go to trial because he was innocent. She denied having robbed Mr. Palmer because he did not have money with which to pay her. Ms. Wiley noted that she assumed Mr. Palmer had money because he owned a nice house and car and that she did not believe he would have invited her to his home if he could not pay her.

On redirect examination, Ms. Wiley denied that she and Mr. Palmer argued about money or that she asked for payment and was refused. She agreed that she and Mr. Palmer had developed a degree of mutual trust as a result of his disclosing to her where he lived. Ms. Wiley stated that after she returned to her car and left Mr. Palmer's house, she saw the Defendant with a gun. She said that she was twenty-seven years old at the time of trial. Ms. Wiley agreed that through her attorney, she had requested that the State reconsider her bond "a lot" before she was eventually released. Ms. Wiley stated that although only she and the Defendant rode together to Mr. Palmer's house, in her opinion, the Defendant had enough time after she left the car to call someone to help him with the robbery. She acknowledged the possibility that a second person was present in the house but left before she emerged from the closet. Ms. Wiley stated that in an attempt to avoid his outstanding warrant, the Defendant gave the police a false birthdate and birthplace when they were arrested in Nevada.

After the close of the State's evidence, the Defendant moved for a judgment of acquittal based upon the inconsistencies in Ms. Wiley's and Mr. Palmer's testimony. The

_____

[4] The letter was not entered as an exhibit.

–11–

trial court denied the motion and stated that inconsistencies in the testimony and witness credibility were questions for the jury. The Defendant presented no proof.

Upon this evidence, the Defendant was convicted as charged. After a sentencing hearing, the trial court imposed an eleven-year sentence for aggravated robbery and a four-year sentence for aggravated burglary, with the sentences ordered to be served concurrently.

The Defendant filed a motion for a new trial in which the general sufficiency of the evidence was challenged. At the motion hearing, the Defendant argued that Mr. Palmer repeatedly lied to the police, undermining his credibility, and that the only other testimony was from Ms. Wiley, who was an accomplice. The trial court found that it was undisputed that the Defendant entered Mr. Palmer's home; a firearm was discharged into the living room ceiling; Mr. Palmer's credit cards were stolen and used at other locations; the Defendant fled to California and had to be extradited to Tennessee; and Ms. Wiley's testimony was generally consistent with that of Mr. Palmer. The court noted the "overwhelming" evidence of the Defendant's guilt and found that the jury resolved any credibility issues and inconsistencies in the testimony in the State's favor. The court denied the motion, and the Defendant timely appealed.

ANALYSIS

The Defendant contends that the evidence is insufficient to support his convictions, arguing that the jury could not reasonably have found the Defendant guilty in light of Ms. Wiley's and Mr. Palmer's "wildly contradictory" testimony, Mr. Palmer's admission that he lied to police, and Ms. Wiley's incentive to shift blame to the Defendant. Relative to inconsistent testimony, the Defendant notes that Mr. Palmer and Ms. Wiley gave differing accounts about how they came into contact with one another, whether they agreed on compensation, and how many men accompanied Ms. Wiley to Mr. Palmer's house. The State responds that the evidence is sufficient.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in

–12–

testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34,43 (Tenn. 1964)). In this case, Ms. Wiley was an accomplice who was indicted for the same offenses as the Defendant. See State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted).

Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). The corroborating evidence need only be "slight." State v. Griffs, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). While "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony," the "evidence is sufficient if it connects the

–13–

accused with the crime in question." Id. Whether there is sufficient corroborating evidence is a question for the jury. Shaw, 37 S.W.3d at 903.

Tennessee Code Annotated section 39-13-401 defines robbery as the intentional or knowing theft of property from the person of another by violence or putting the person in fear. A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. A person acts knowingly "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist" or "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-106(a)(20). As relevant to this case, robbery is elevated to aggravated robbery when it is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402. Aggravated burglary occurs, in relevant part, when a person enters a habitation without the effective consent of the owner and with the "intent to commit a . . . theft[.]" Tenn. Code Ann. §§ 39-14-402(a)(1), -14-403(a).

The Defendant's sufficiency argument is without merit because it relies solely on the credibility of the witnesses and the ability of the jury to reconcile inconsistencies in the testimony. We have repeatedly stated that such determinations are the province of the finder of fact and will not be disturbed on appeal. See Bland, 958 S.W.2d at 659. The jury, by its verdict, credited Mr. Palmer's identification of the Defendant as the person who entered his home, robbed him, and fired a shot into the living room ceiling, as well as Ms. Wiley's testimony that the Defendant accompanied her to the house, that she heard the Defendant demand money from Mr. Palmer, that she heard a gunshot, and that she saw the Defendant with a gun and Mr. Palmer's wallet after the robbery. We note that the jury was free to credit portions of the testimony while rejecting others. See State v. Winters, 137 S.W.3d 641, 658 (Tenn. Crim. App. 2003) (concluding that "the jury's role as the trier of fact is to determine which portions of the evidence are illustrative of the truth relative to disputed events").

We note that Ms. Wiley's accomplice testimony was amply corroborated by Mr. Palmer and the other evidence. Both witnesses agreed that Ms. Wiley came to the house in order to engage in sexual activity with Mr. Palmer; Ms. Wiley showered because her clothing was wet; she and Mr. Palmer drank wine; they were engaging in sexual intercourse when the front door alarm sounded; Mr. Palmer believed his son had come home early and told Ms. Wiley to hide in a closet; the Defendant demanded money from Mr. Palmer; a gunshot was fired into the ceiling; the Defendant took Mr. Palmer's wallet; Ms. Wiley fled from the house nude; Mr. Palmer's credit card was subsequently used at a convenience

–14–

store; and the Defendant sent Mr. Palmer threatening text messages in an attempt to extort money from him.

In the light most favorable to the State, the record reflects that during a sexual encounter between Mr. Palmer and Ms. Wiley, the Defendant entered Mr. Palmer's house without invitation, pointed a gun at Mr. Palmer, demanded money, took Mr. Palmer's wallet, and fired a shot into the living room ceiling. Mr. Palmer's credit cards were subsequently used at a convenience store and two other retail establishments, and the police observed a bullet hole in the living room ceiling and recovered a shell casing in the house. Early the next morning, Mr. Palmer received a series of text messages from a cell phone registered to Diane Rogers, whom police ascertained had previously registered for a marriage license with the Defendant. Ms. Wiley also observed the messages on a cell phone she knew belonged to the Defendant. In the messages, the Defendant pretended to be Ms. Wiley's father and claimed that she was a minor; the Defendant threatened to communicate Mr. Palmer's sexual activities to his wife unless Mr. Palmer paid the Defendant $3,000. In addition, the Defendant and Ms. Wiley fled to California and Nevada before they were apprehended some months later.

Relative to Ms. Wiley's statement that she did not see a second man in the house after the robbery, she acknowledged that the Defendant had time to call another person to help him commit the robbery and that such a person could have left the house before she emerged from the closet. Moreover, although the testimony regarding the manner in which Mr. Palmer and Ms. Wiley became acquainted and the transactional nature of the sexual encounter was in some dispute, the jury was free to credit portions of the testimony, and we note that the testimony regarding the Defendant's role in the robbery was consistent. The evidence was sufficient for a reasonable jury to have found that the Defendant entered Mr. Palmer's house without permission with the intent to commit a theft, brandished a deadly weapon, a handgun, at Mr. Palmer and fired it within the home, and took property from Mr. Palmer by placing him in fear for his safety. The Defendant is not entitled to relief on this basis.

## CONCLUSION

In light of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

–15–